J. SCOFIELD ROWE *v.* JAMES K. CULLEN, EXECUTOR

[No. 55, October Term, 1939.]

358

*Decided November 29th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Webster C. Tall,* for the appellant.

*John K. Cullen,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The first question presented by this appeal is whether an illegitimate child is a "descendant" of his mother within the meaning of Code, art. 93, sec. 311, which provides that, if the surviving spouse of a testator elects to renounce any provision for his benefit made by the will, he shall take one-third of the estate, if the testator leave "descendants" surviving, one-half if the deceased spouse is not survived by "descendants."

Rosalie E. Rowe, a resident of Baltimore County, died on December 4th, 1937, leaving a will executed in due form, which in ordinary course was admitted to probate on December 27th, 1937, in the Orphans' Court of Baltimore County, and in it she devised certain real property to J. Scofield Rowe, her husband. The

husband, apparently on the same day, filed a renunciation of the will, and an election to take in lieu thereof his legal share of his wife's estate. Mrs. Rowe left surviving a son, who, for the purposes of this case, may be assumed to be illegitimate. Upon those facts the husband, the appellant, contends that he is entitled to receive one-half of his wife's estate, because, he says, the son is not a "descendant" within the meaning of the statute; the executors, the appellees, contend that he is only entitled to receive one-third of the estate, because, they say, the son is a "descendant" within the meaning of that statute. The court decided that issue in favor of the executors, and the husband appealed.

The literal and etymological meaning of the word "descendant," when used to describe the lineage of members of a family, is equivalent to issue, progeny, or offspring (*Crabb's Synonyms; John Deere Plow Co. v. Gooch,* 230 Mo. App. 150, 91 S. W. 2nd 149), and includes all who are descended as issue lineally from another. *Wright v. City of Tuscaloosa,* 236 Ala. 374, 182 So. 72, 76, *Herrick's Estate,* 152 Misc. 9, 273 N. Y. Supp. 803, 2 *Words and Phrases, Third Series,* p. 996.

In the law of descent and distribution, however, it has been given both a broader and a narrower meaning, according to the nature of the object it is used to describe. When used in a statute of descent and distribution it has been held to mean all to whom the estate descended. 2 *Words and Phrases, Fifth Series,* p. 351; *Oakley v. Davey,* 49 Ohio App. 113, 195 N. E. 406. On the other hand it has been held not to include the natural or illegitimate child of a deceased mother. *Wilson v. Bass,* 70 Ind. App. 116, 118 N. E. 379, 380.

That variance in interpretation reflects the efforts of courts to construe the word so as to serve some policy prevailing in the jurisdiction where the question arose. When construing statutes of descent and distribution in connection with their application to legitimates, the courts ordinarily gave to such words as "descendants," "children," "issue," and the like, their literal and ac-

customed meaning, but when applied to illegitimate children they often gave them a narrower artificial meaning quite different from their actual literal significance, so as to exclude illegitimates from sharing in the estates of their parents. 7 *Am. Jur. "Bastards,"* secs. 153, 138 *et seq.* That purpose was in complete accord with the spirit of the early common law of England, which, following the Germanic rather than the Roman law, dealt with illegitimate children with inhuman and barbaric harshness. *Roman Law in the Modern World, Sherman,* secs. 492, 493; *Encycl. Brittanica, "Bastards;"* 7 *Am. Jur.* 724. So it is said: "In early times bastardy was considered so disgraceful 'that to retain a bastard in a man's house was a reflection and the stain and reproach of the parents.' Crime dwelt always upon him so that he could not be admitted to feudal service. He was treated by the common law with great strictness, and was allowed but few privileges. For example, he was denied all rights as an heir, and he was not entitled even to a name, although he might gain one by reputation. He did not take his mother's place of settlement, but was settled wherever he chanced to be born. As he was related to nobody, he could have no heirs, except of his own body; and so, if he left no descendants, his property escheated. He was incapable of holy orders, and was disqualified from holding any dignity in the church. In Germany, no farther back than the time of the Reformation, bastards could not give evidence on the rights of citizens, and down to a very recent period certain Saxon local laws enacted that no persons of illegitimate birth should officiate in any judicial office. Inquiries were made into the birth of a person, at the academies and schools, before he was admitted to the degree of doctor, or of any other high dignity. By the law of Scotland he was disabled, *ex defectu natalium,* from bequeathing by testament without letters of legitimation from the sovereign." 7 *Am. Jur.* 712.

But the severity of those early rules has been relaxed nearly everywhere. Certainly in this country, ordinarily

by statute, but in one instance at least by judicial decision (*Eaton v. Eaton*, 88 Conn. 286, 91 A. 196), the trend of the law has been to give to illegitimate children the status and privileges of legitimate children, except where that policy would affect the permanence and dignity of the institution of marriage, or the traditional rights and privileges of children born in lawful wedlock, 7 *Am. Jur.* sec. 151; 10 *C. J. S., Bastards,* sec. 25, p. 112.

One instance of that growing liberality in the attitude of the state towards illegitimate children is found in the many statutes allowing them to inherit from their mothers. At common law a bastard was spoken of as *filius nullius* or *filius populi,* 10 *C. J. S., Bastards,* sec. 23, p. 105, and was regarded as without parents or kindred (*Ibid;* 7 *Am. Jur.* 724), and that law did not admit that for purposes of inheritance a bastard could have a mother. *Ibid.* So that, unless granted by a statute, a bastard has no right to inherit from his mother. *Ibid.*

In conformity with the general trend, this State in 1825 provided that: "The illegitimate child or children of any female, and the issue of any such illegitimate child or children shall be capable to take real or personal estate from their mother, or from each other, or from the descendants of each other, in like manner as if born in lawful wedlock." By Code, art. 93, sec. 125, it is provided that, "If the intestate leave a surviving husband or widow, as the case may be, and no child, parent, grandchild, brother or sister, or the child of a brother or sister of the said intestate, the said surviving husband or widow, as the case may be, shall be entitled to the whole." Code, art. 46, sec. 7, provides that: "The illegitimate child or children of any female, and the issue of any such illegitimate child or children shall be capable in law to take and inherit both real and personal estate from their mother, or from each other, or from the descendants of each other, as the case may be; and where such illegitimate child or children shall die, leaving no descendants or brothers or sisters, or the descendants of such brothers or sisters, then and in that case, the mother of

such illegitimate child or children, if living, shall inherit both real and personal estate from such illegitimate child or children; and if the mother be dead, then and in that case, the heirs at law of the mother shall inherit the real and personal estate of such illegitimate child or children in like manner as if such illegimate child or children had been born in lawful wedlock." *Ibid,* article 93, section 311, provides that in the event that a surviving spouse renounces any devise or bequest for his or her benefit in a will of a deceased spouse and elects to take in lieu thereof his or her legal share of the estate: "If the election be of the legal share of both real and personal estate, the surviving husband or wife shall take one-third of the lands, as an heir, and one-third of the surplus personal estate (if the deceased spouse shall be survived by descendants) and one-half of the lands, as an heir, and one-half of the surplus personal estate (if the deceased spouse shall not be survived by descendants) and no more." And as an index of its policy the General Assembly in 1937 provided that: "The word child or its equivalent shall be construed to include any illegitimate child, except in matters of inheritance, descent or distribution of real and personal property, unless such a construction would be unreasonable." Acts 1937, ch. 74. Code, art. 93, sec. 311, provides that the surviving spouse shall, in the event of an election to take under the statutes of descent and distribution instead of under the will, take only one-third of the land and one-third of the personal estate if the deceased spouse be survived "by descendants." It does not seem possible to define a right in clearer terms than is done in that statute, unless the word "descendant" is to be given a forced, unnatural, and artificial meaning, in order to defeat the clear and unmistakable purpose and intent of the statute so as to gratify a harsh policy that has been repudiated for more than a century. But appellant contends that while an illegitimate child may be a child, it is not a "descendant" within the meaning of the statute.

In *Reese v. Starner*, 106 Md. 50, 52, 66 A. 443, it is said: "Whatever then may have been the law of this State prior to the passage of Act 1868, p. 355, ch. 199, codified as article 46, section 30, of the Code of Public General Laws of 1888, and the same section and article of Code 1904, it must be clear that since this act the mother of an illegitimate child, dying without descendants, or brothers or sisters or the descendants of such brothers, or sisters, can inherit both real and personal estate from such illegitimate child." So in *Barron v. Zimmerman*, 117 Md. 296, 83 A. 258, 259, where the court said: "The decisive question thus presented is not whether the appellant would be so entitled merely by force of the section making him capable of inheriting direct from his mother, or whether the term 'child' as ordinarily used in a statute would include an illegitimate, but whether, under a codified system of laws by which such a person is invested with the full qualification of legitimacy with reference to the inheritance of his mother's estate, he is within the purview of a constitutent provision that the estate which the deceased mother would have inherited shall pass to her 'child or children.' In our judgment this question should be answered in the affirmative. It would certainly seem to be a reasonable construction of statutory provisions which are codified together as parts of the same general plan of descent and distribution to hold that one who is placed in the position of a lawfully begotten child for the purpose of inheriting from his mother should be regarded as a 'child' of the mother within the intent of the law for the purpose of suceeding to the estate which she would have inherited if she had survived." In the Act of 1825 the word "descendants" is used as synonymous with issue or children, and it is so used in Code, art. 93, sec. 125.

In *Earle v. Davis*, 3 Md. Ch. 230, 231, it was held that, so far as the inheritance of the mother's estate is concerned, all her children stand upon the same footing without regard to their legitimacy. In that case, construing the Act of 1825, the court said:

"There is certainly nothing in the words of the Act which should confine its operation to the case of a woman leaving none but illegitimate offspring, and I can conceive of no public policy looking to the morals of society, which recommends the restricted construction contended for. If the law be as the defendant's counsel supposes, then an unmarried woman who has wandered or been seduced from the path of virtue, can never marry and give birth to legitimate offspring, without incurring the risk of cutting off the innocent fruit of her crime from the benefit of any property she may leave, as from a variety of circumstances it may be found impossible to bring such offspring, within the provision of the law of 1820, ch. 191. She may either not marry the father of her illegitimate child, or if she does, he may not choose to acknowledge it as prescribed by the Act.

"But, independent of any such reasoning, the language of the Act of 1825 leaves, as I think, no room for doubt upon the subject. The illegitimate child or children take and inherit from the mother as if born in lawful wedlock. They are, therefore, so far as the estate of the mother is concerned, placed in the condition of legitimate children in all respects, and to every intent, and it can make no difference whether the mother leaves other children born in lawful wedlock. Those born out of wedlock are, by the force of this legislative enactment, made to take as if born in it. The stain of their birth, so far as respects the capacity to inherit from the mother and from each other is removed and the birth of other children of the same mother, under happier circumstances, was never designed by the makers of the law to renew the blot with its disabling consequences."

So it was held that, by virtue of the Act of 1825, under the general statutes of descent and distribution, an illegitimate child was entitled to share equally with the legitimate children in the estate of its deceased mother. If therefore the mother of an illegitimate child is a "parent" (*Reese v. Starner, supra*), and the word "child" includes an illegitimate child (*Barron v. Zimmerman,*

*supra*), within the meaning of the statutes of descent and distribution, such a child must also be a "descendant" of its mother, since in respect to sharing in her estate it possesses every natural and statutory right which a legitimate child has.

Literally, as a child is a descendant and, under the Act of 1825, an illegitimate child is a descendant who may inherit from its mother as though it were legitimate, the conclusion is inevitable that an illegitimate child is a descendant within the meaning of article 93, section 311. The purpose and intent which give that statute life is to measure the husband's share in the estate of his deceased wife by the share which her children might naturally expect as their due, and if, under the law, the claims of all of her children, legitimate and illegitimate, are equal and there is no discrimination against illegitimate children because they are illegitimate, there is no possible reason why the word "descendants" in Code, art. 93, sec. 311, should not apply indiscriminately to both classes, when its meaning is in issue in connection with the distribution of the estate of the mother of an illegitimate child. The same conclusion was reached in a well reasoned opinion in *Rhode Island Hospital Trust Co. v. Hodgkin,* 48 R. I. 459, 137 A. 381, where the court held that, under a statute similar to that under consideration here, an illegitimate child was a "descendant" of the mother, and so entitled to take under a devise to the "descendants" of the mother. In the course of the opinion the court made this reference to the earlier case of *Briggs v. Greene,* 10 R. I. 495: "The question presented in *Briggs v. Greene* was whether, upon the death of an illegitimate intestate after the death of his mother, the estate of such illegitimate would pass to another illegitimate child of the same mother under the third provision of our statute of descent, viz.: 'If there be no (parent), then * * * to the * * * brothers, and sisters' of such intestate 'or their descendants, or such of them as there be.' * * * Thus the court held that by reason

of the remedial statute the third provision of our statute of descent did not restrict the descent therein provided between brothers and sisters to legitimate brothers and sisters, but enlarged that provision to include the illegitimate children of a mother equally with her legitimate children." 10 *C. J. S., Bastards,* secs. 24, 25. And it has been held that statutes granting to illegitimate children the right to inherit should be construed *in pari materia* with the general statutes of descent and distribution, 10 *C. J. S., Bastards,* sec. 24, p. 110; note *Ann. Cas.* 1913 C. 1335. So that in Code, art. 93, sec. 311, the word "descendants" would have two meanings, one, its natural ordinary etymological meaning, when used in connection with the right of an illegitimate child to inherit from its mother, the other a narrower, artificial, meaning, when used in connection with the right of such a child to inherit from its father. In the first case it would include an illegitimate child, because the statute expressly gives such a child the right to inherit from the mother, in the second it would exclude an illegitimate child, because neither at common law nor under the statute has such a child the right to inherit from its father.

It follows therefore that Rosalie E. Rowe left an illegitimate son who is also her descendant within the meaning of Code, art. 93, sec. 311, and that the court in directing that one-third of her estate be distributed to her surviving husband properly construed the statute.

The only other question before us is whether the husband is entitled to an allowance of $2000 under the provisions of Code, art. 93, sec. 311, as amended by chapter 499 of the Acts of 1939. The amendment provides that if the surviving spouse elects to take under the law instead of under the will of the deceased spouse, the surviving spouse so electing shall receive in addition to one-third or one-half of the estate, as the case may be, the sum of $2000; said allowance of $2000 to be made only if the deceased spouse leaves to survive neither child, descendant, father nor mother, but does leave

surviving a brother, a sister-or a child or descendant of a brother or sister. The appellant claimed that he was entitled to that allowance in this case, but the court in its order denied his contention and refused to make the allowance.

Mrs. Rowe died testate on December 14th, 1937. Chapter 499 of the Acts of 1939 was approved on May 3rd, 1939, and took effect on June 1st, 1939. Ordinarily the rights of heirs and distributees become fixed and vested at the death of the ancestor (16 *Am. Jur.*, "*Descent and Distribution*," secs. 20, 15, 21), and the rights of devisees and legatees under a will, at the death of the testator (69 *C. J.* 1150), although it has been held in one case that distribution is controlled by the law as it exists at the time of distribution and not as it exists at the date of the ancestor's death (*Armstrong v. Armstrong's Estate,* 1 Or. 207). But the rule as stated, while contrary to that view, is supported by the general weight of authority and may be accepted as settled law. *Craig v. Craig,* 140 Md. 322, 326, 117 A. 756; *Stahl v. Emery,* 147 Md. 123, 128, 127 A. 760; *Bartlett v. Ligon,* 135 Md. 620, 626, 109 A. 473; *Krieg v. McComas,* 126 Md. 377, 383, 95 A. 68.

The statute under consideration was passed after the death of Mrs. Rowe, and unless construed to operate retroactively, it would not affect the rights of either her surviving husband or the legatees or devisees under her will. There is nothing in the words of the statute indicating a legislative intent that it be so construed, and the principle is firmly established that a statute will not be construed to operate retroactively unless the legislative will and intent that it be so construed is expressed in language so imperative and explicit as to permit no other construction. 59 *C. J., "Statutes"* sec. 692; *Ireland v. Shipley,* 169 Md. 90, 98, 166 A. 593, and cases there cited. For, as said in *Hemsley v. Hollingsworth,* 119 Md. 431, 441, 87 A. 506, 510, "statutes which are retroactive in their effect are not favored, even if they do not conflict

with vested or other rights guaranteed by the Constitution. They strike from behind, and not in the face, where they can be provided for or against. Some of them are exceedingly dangerous, as they are sometimes passed to reach particular cases which are not disclosed to the Legislature. When a statute is susceptible of a construction which will make it prospective, rather than retroactive, especially if by the latter manifest injury may be done, it is the duty of the court to construe it to be prospective, and it should not be held to be retroactive unless its terms are such as to make that construction imperative." See also *Dallam v. Oliver's Excrs.*, 3 Gill 445.

In this case the sum which the appellant claims, if his claim is allowed, would necessarily be paid from the share of the residuary legatee, whose right to receive the same became fixed and vested at the testator's death. It is idle to say that the Legislature had no power to take the property of the residuary legatee from him and give it to the surviving husband, for it did not attempt to say that, and the courts cannot read into what it did say a meaning in patent and manifest conflict with the purpose and intent of the statute, which was that it should only apply to the estates of persons dying testate on or after June 1st, 1939, leaving spouses to survive who elect to take under the law and renounce the will. There was therefore no error in the order appealed from, and it must be affirmed.

*Order affirmed, with costs.*