Michael T. MANLEY, Respondent,

v.

William C. MEYER and Linda Meyer, Appellants.

No. SD 30709.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 28, 2011.

Motion for Rehearing and Transfer Denied Oct. 13, 2011.

Dan J. Pingelton, Columbia, MO, for Appellant.

Edward D. Hoertel, Rolla, MO, for Respondent.

WILLIAM W. FRANCIS, JR.,
Presiding Judge.

William and Linda Meyer (individually "William" and "Linda" and collectively the "Meyers")[1] appeal the trial court's judgment in favor of Michael T. Manley ("Manley") for $28,000 in damages against the Meyers, jointly and severally. The Meyers allege that there was insufficient evidence to support the damage sum and there was no evidence to support Linda was liable under any of the claims. Finding no merit to the Meyers' claims, we affirm the judgment.

### Factual and Procedural History

In the fall of 2007, Manley entered into a verbal lease agreement with the Meyers for use of their pastureland for $1,000 for a one-year period. Pursuant to the terms of the lease agreement, Manley was permitted to use the land to graze cattle, harvest hay, hunt, and ride all terrain vehicles. Manley delivered 1 bull and 10 cows to the Meyers' property. It was agreed that Manley would pay the $1,000 by the end of the one year or upon the sale of his cattle. There was no arrangement between Manley and the Meyers for the Meyers to provide feed and feed the cattle. Manley believed there was enough grass on the property to feed the cattle unless it snowed and covered up the grass. In the event snow occurred, Manley had preplanned and brought out 10 to 12 large bales of hay that could be fed to his cattle.

On August 1, 2008, the Meyers filed a "landlord's petition" after an incident with Manley, unrelated to the lease agreement. On September 8, 2008, the date of trial, the parties entered into a settlement agreement which terms were set forth in a "Memorandum" signed by Manley and the Meyers, and filed with the court.[2] As part of the settlement agreement, Manley was to pay the Meyers $1,000 for rent and another $125 for a pig Manley purchased from the Meyers. Manley was also to remove his cattle from the Meyers' pasture by September 10, 2008. The Meyers were to permit Manley access to their property for the removal of the cattle. The Meyers also agreed to return Manley's 12-gauge shotgun and camper that had been left on their property. There was no allegation in the Meyers' landlord petition for recovery of money for hay, and there had been no previous agreement between Manley and the Meyers for Manley to pay them money for hay.

On September 9, 2008, Manley was able to retrieve only a portion of his herd—8 cows and 1 calf. On September 10, 2008, Manley was unable to round up and remove the remaining cattle. The Meyers had imposed restrictions on Manley's use of all-terrain vehicles, horses, or dogs to help round up the cattle. The cattle were scattered over approximately 57 acres. Manley attempted to reschedule a time when he could remove the remaining cattle and was told by the Meyers that if Manley brought out feed, William would construct a "catch" pen and they would help Manley "feed the cows into the pen." The Meyers agreed to call Manley when the cows were penned and ready to be removed. Over the next several months, Manley continued to provide feed for his cattle, but was unable to retrieve the cattle. When Manley attempted to schedule a time with the Meyers to retrieve his cattle, he would be told the cattle "were not ready to be

1. Because the Appellants share the same surname, we use their first names for clarity. No familiarity or disrespect is intended.

2. This agreement was entered into evidence as Exhibit 3; however, it was not deposited with this Court.

picked up," or they "wouldn't be in town," or "were busy."

On December 2, 2008, Manley received a phone call from Linda requesting Manley bring out additional feed for his cattle. Instead, Manley advised Linda that he would be out that afternoon to retrieve the cattle. Linda indicated William was not home and she would call him. Linda then advised that William was on his way to "either let [them] in the pens or tell [them] to leave." Deputy James Arnold, with the Phelps County Sheriff's Department, accompanied Manley to the Meyers' farm on orders "to keep the peace for a civil standby" and remain until Manley retrieved his cattle. When Deputy Arnold arrived, Manley had backed his truck and trailer up to the cattle pen and was waiting on William to arrive to unlock the gate. Upon the arrival of William and Linda, Manley requested that William unlock the gate, but William refused and demanded that Manley give him three calves as reimbursement for feeding Manley's herd. When Manley refused, William gave Manley a trespass warning and asked him to leave. Deputy Arnold informed Manley his orders were that if "Mr. Meyer arrived on the property and told Manley that he couldn't have the cattle, [Manley] had to leave[.]" Manley understood and left the Meyers' property without retrieving his remaining cattle.

On March 18, 2009, Manley filed suit against the Meyers. Manley's First Amended Petition, filed February 11, 2010, alleged: (1) the Meyers intentionally converted Manley's cattle and personal property to their own benefit; (2) the Meyers failed and refused to return possession of disputed property or permit Manley to take possession; and (3) the Meyers breached their settlement agreement with Manley.[3] Manley sought actual damages in the amount of $28,000 for "approximately 18 Black cows, 1 Black bull and 14 Black calves which, when last seen by [Manley], were located on pasture land owned and controlled by [the Meyers]." Additionally, Manley claimed the Meyers possessed his "Mossberg 935 automatic 12 gauge shotgun" and twelve cattle panels. He also sought punitive damages.

On February 16, 2010, the Meyers filed their "Amended Counterclaim" alleging Manley owed them $2,340, for hay fed to the cattle through the date of trial; $1,500, for boarding and pasture rental; and $500, for "labor and material for fence repair."

On March 8, 2010, a bench trial was held. At trial, Manley testified his shotgun was worth $600 and his twelve cattle panels were worth about $150 each. Manley also testified that shortly after he delivered 1 bull and 10 cows to the Meyers' property, the cows produced 11 calves. He further explained that some of these calves matured and had calves themselves, and that is how he arrived at the claim for 18 cows, 1 bull and 14 calves. Manley specifically noted this number did not include the nine animals he removed. Manley explained that in arriving at the amount of $28,000, he used "the price of what the cattle would be if they were sold as of that time . . . ." Manley testified he also periodically looked in publications and checked sale barns to determine the going rate for cattle. No objections were made as to any of Manley's testimony on these subjects.

The trial court admitted a June 1, 2007 invoice showing Manley purchased the bull for $1,100 and the 10 cows for $10,300.

---

3. Manley's pleadings are far from clear and refer to both the lease agreement and the settlement agreement entered into by the parties on September 8, 2008. Nevertheless, as best we can discern, Manley's pleadings present issues alleging breach of the original agreement, and breach of the September 8, 2008 settlement agreement.

William testified that Manley brought 1 bull, 10 cows, and 6 calves to the farm. He claimed "one bull, two cows, and maybe six other" remained. He explained that "one old cow" had reproduced. William testified that he had some of his own cattle in the pasture with Manley's herd—2 cows and 4 calves. He said he was able to distinguish the animals based on their coloration. William testified he fed Manley's cattle 20 bales of hay during the 2008–2009 winter, followed by an additional 30 bales during the winter of 2010, with each bale costing $50.

On June 7, 2010, the trial court entered judgment in favor of Manley for $28,000 in actual damages, and against the Meyers on their counter-claim. No punitive damages were awarded. This appeal followed.

First, the Meyers contend the evidence was insufficient to support the amount of damages in that there was no evidence supporting the number of animals born after delivery to the leased land and insufficient evidence of the value of the cows other than the original animals. The Meyers also claim the trial court erred in entering judgment against Linda because there was no evidence establishing her liability under any of the claims made by Manley.[4] Thus, the primary issues for our determination are:

1. Was there substantial evidence to support the trial court's award of $28,000 in damages?

2. Was there substantial evidence to support the trial court's finding against Linda?

## Standard of Review

In a court-tried case, appellate review is governed by Rule 84.13(d)[5] and the principles articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[6] Accordingly, the judgment must be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Dennis v. Henley*, 314 S.W.3d 786, 787 (Mo.App. S.D. 2010). "Where, as here, the trial court makes no findings of fact, this court considers all fact issues to have been found in accordance with the result reached." *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo. App. S.D.2001). Accordingly, we accept all evidence and inferences therefrom in the light most favorable to the prevailing party, and must give due regard to the trial court's witness credibility determinations. *Williams v. Williams*, 99 S.W.3d 552, 556 (Mo.App. W.D.2003).

### Point I: Damage Award

The Meyers' brief claims that beyond the evidence showing the value of the cows Manley originally delivered to the farm, there is only speculative evidence as to the value of the second and third generation animals which the Meyers retained on their property. We, however, find substantial evidence supported the trial court's award.

"The trial court's findings related to actual damages are entitled to great weight on appeal and will not be disturbed unless the damages awarded are clearly wrong, could not have been reasonably deter-

---

4. Manley did not file a brief. While there is no penalty for that omission, it requires this court to adjudicate the Meyers' claims of error without the benefit of whatever argument, if any, Manley could have made in response. *In re Estate of Klaas*, 8 S.W.3d 906, 908 (Mo.App. S.D.2000).

5. All rule references are to Missouri Court Rules (2011).

6. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

mined, or were excessive." *Williams,* 99 S.W.3d at 557. " 'A party claiming damages for breach of contract bears the burden of proving the existence and amount of damages with reasonable certainty. Stated otherwise, proof of actual facts which present a basis for a rational estimate of damages without resorting to speculation is required.' " [7] *Rissler v. Heinzler,* 316 S.W.3d 533, 536–37 (Mo.App. W.D.2010) (quoting *Delgado,* 55 S.W.3d at 512). Generally, the offspring of animals, as well as the growth and increase of property, follows the ownership of the mother. *John Deere Plow Co. v. Gooch,* 230 Mo.App. 150, 91 S.W.2d 149, 156 (Mo.App.ST.L.D.1936).

Manley testified as to the number of cows he delivered and that these cows subsequently reproduced 11 calves, and that those calves matured and had calves themselves. He specifically explained that this was how he arrived at his claim for 18 cows, 1 bull and 14 calves, and noted this did not include the animals Manley had retrieved from the property.[8] Furthermore, he explained that he used "the price of what the cattle would be if they were sold as of that time . . . ." Manley testified he periodically looked in publications and checked sale barns to determine the going rate for cattle.

While the Meyers claim Manley had no actual knowledge that any of his original cows had reproduced, Manley specifically testified that the original 10 cows had 11 calves shortly after they were delivered to the Meyers' property and that after Manley was prohibited from entering the Meyers' property, he drove by and saw small black calves. He further noted that he knew these were not the Meyers' calves because they were black and the Meyers' cows had different coloration. Importantly, Manley's testimony was admitted into evidence without objection and was properly before the trial court to consider. Additionally, we note the Meyers denied Manley access to further verify this number. These facts present a basis for a rational estimate of damages without resorting to mere speculation.

As such, we find substantial evidence to support the trial court's damages award. Point I is denied.

### Point II: Judgment Against Linda

■ Next, the Meyers argue the trial court erred in entering judgment against Linda because there was no evidence establishing her liability under any of the claims made by Manley. The Meyers base their argument on the assumption that the trial court's judgment must be based on a theory of conversion. However, the Meyers do not claim any error in the trial court's finding against the Meyers based on Count III—breach of agreement with Manley to return property upon payment of a sum of money; their argument is merely that there is "no evidence that [Linda] authorized or ratified her hus-

---

7. It should be noted that neither party requested findings of fact or conclusions of law, and none were made. Under these circumstances, we presume that all fact issues were found in accordance with the judgment, and we may uphold the judgment under any reasonable theory presented and supported by the evidence. *Jordan v. Stallings,* 911 S.W.2d 653, 659 (Mo.App. S.D.1995). We may presume, therefore, that the trial court found the Meyers breached the settlement agreement by withholding Manley's cattle unless Manley gave them three calves and analyze the first point on appeal under this theory. An agreement to settle is governed by contract law. *Tirmenstein v. Central States Basement and Foundation Repair, Inc.,* 148 S.W.3d 849, 851 (Mo.App. E.D.2004).

8. William testified that there was only "one bull, two cows, maybe six other" belonging to Manley on his property at the time of trial. However, the trial court was free to believe all, none, or part of his testimony. *Tadych v. Horner,* 336 S.W.3d 174, 177 (Mo.App. W.D. 2011).

band's conversion of [Manley's] livestock." This argument fails because the trial court could have found Linda liable under Count III, which she does not contest. *See Jordan v. Stallings*, 911 S.W.2d 653, 659 (Mo. App. S.D.1995).

Count III involved a breach of the settlement agreement resulting from the Meyers' landlord petition wherein the Meyers agreed, in exchange for payment of $1,125, to permit Manley access to their property to retrieve his cattle and other personal property. Importantly, both Linda and William were parties to, and signed this agreement. Additionally, on December 2, 2008, when Linda called Manley to bring more feed out for his cattle and Manley advised her he wanted to retrieve his cattle that afternoon, Linda specifically told Manley that William might let him in the pens or might tell Manley to leave. Although the Meyers deny Linda was present when William demanded Manley give him three calves or he would not open the pens and let Manley remove his cattle, Deputy Arnold testified he believed Linda was with William when William arrived to unlock the gate.

As such, we find there was substantial evidence to support Linda's liability. Point denied. The judgment of the trial court is affirmed.

BARNEY, J. and BATES, J., concur.